IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

BRIDGET A. YOUNG,
      Plaintiff,

vs.                                Case No. 1:06cv166/MMP/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act").  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381–83.[1]

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

---

[1]In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, citations in this report and recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

## I.    PROCEDURAL HISTORY

On August 25, 2003, Plaintiff protectively filed applications for DIB under Title II and SSI under Title XVI of the Act (Tr. 56–58, 335–38).[2]  Plaintiff alleged an onset of disability date of October 12, 2002 (Tr. 56, 63, 67, 335).   Plaintiff's claims were denied initially and on reconsideration (Tr. 24–25, 32–33, 37–39, 342–52).   On April 11, 2006, following a hearing, an administrative law judge ("ALJ") found that Plaintiff was not under a "disability" as defined in the Act (Tr. 14–21).   On June 22, 2006, the Appeals Council of the Social Security Administration denied Plaintiff's request for review after considering additional evidence submitted by Plaintiff (Tr. 6–8).[3]  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.   Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).   This appeal followed.

## II.    FINDINGS OF THE ALJ

On April 11, 2006, the ALJ made several findings relative to the issues raised in this appeal (Tr. 14–21):

1)    Plaintiff met the disability insured status requirements of the Act on October 12, 2002, and she continues to meet them through March 31, 2008.

2)    Earnings of $1,588.00 are posted to Plaintiff's record for 2003, and she has earnings of $432.40 posted to her record for 2005, but these earnings do not appear to represent sustained substantial gainful activity ("SGA"); thus, Plaintiff has not engaged in SGA since her alleged onset of disability (20 C.F.R. § 404.1572).

3)    The objective medical evidence discloses that Plaintiff has the following severe impairments: complaints of neck and back pain, status-post anterior cervical fusion at C4–C5 with hardware and screws; right carpal tunnel syndrome; a history of gastritis; and treatment for Helicobacter Pylori with resolution of abdominal pain in 2004. However, Plaintiff does not have an impairment or combination of impairments that specifically meets or medically equals any of the listed impairments in Appendix 1, Subpart P of Regulation No. 4.

---

[2]All references to "Tr." refer to the Transcript of Social Security Administration Record filed on December 7, 2006 (Doc. 10).

[3]Plaintiff submitted a medical report by Jesse A. Lipnick, M.D., dated March 26, 2006, concerning a spinal procedure he performed on Plaintiff.  This report is described infra.

Case No. 1:06cv166/MMP/EMT

4)      After carefully considering all of the evidence, including Plaintiff's testimony, the evidence shows that Plaintiff has retained the residual functional capacity ("RFC") to perform work that does not require exertion above the light level (work involving lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds, and no more than occasional climbing or crawling, limited overhead reaching, and avoidance of unprotected heights ( 20 C.F.R. § 404.1567(b)).

5)      In determining Plaintiff's maximum RFC, the ALJ considered all of the relevant medical evidence, including medical evidence, medical opinions, and Plaintiff's subjective complaints (20 C.F.R. § 404.1527 and SSR 96-2p; 20 C.F.R. § 404.1529 and SSR 96-7p).

6)      Plaintiff's subjective complaints and alleged limitations are not credible.

7)      Plaintiff retains the RFC to perform her past relevant work as she described it.

## III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L.

Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her/his previous work, "but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  <i>Id</i>. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing SGA, she is not disabled.

2.      If the claimant is not performing SGA, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing SGA and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment,

the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A.     Personal History

Plaintiff was born on July 23, 1963, and she alleges disability as of October 12, 2002, due to cervical myelopathy, chronic cervical/lumbar back pain, carpal tunnel syndrome, migraine headaches, swelling of ankles, and loss of strength in her right arm (see Tr. 59, 71, 80).

On September 30, 2003, Plaintiff completed a disability report (Tr. 70–79).[4]  The report indicates that Plaintiff claimed disability due to cervical myelopathy; chronic cervical/lumbar back pain; carpal tunnel syndrome in her right hand with loss of sensation and numbness, pain, and tingling in her fingers; migraine headaches; swelling of ankles; and loss of strength in her right arm (Tr. 71).  Plaintiff claimed that when her condition first began to bother her, she worked fewer hours, changed her job duties, and made other job-related changes (id.).  As the pain became worse, Plaintiff claimed that she was unable to continue working (id.).  Plaintiff stopped working on October 12, 2002, for "health reasons," including carpel tunnel syndrome, "hand—very serve," chronic cervical and lumbar back pain, muscle spasms, and headaches that "placed [her] at less than 100% capacity to perform [her] job duties . . . ." (id.).  Plaintiff indicated that she previously worked as a Department of Corrections ("DOC") officer from 1992 until October 12, 2002, and as a housekeeper from 1986 until March 1992 (Tr. 72).[5]  Plaintiff stated that in her DOC position she handled large and small objects and that she stood or walked seven hours in an eight-hour day — she was "constantly standing, walking, [and] moving" (id.).  She explained that she carried mail bags, health and comfort items, and paint cans (id.).  She frequently lifted less than ten pounds but

---

[4]Substantially the same information appears on a disability report filed on October 9, 2003 (Tr. 80–87).

[5]A work history report contains much of the same information and additionally indicates that Plaintiff served as a United States Army Reservist for several months in 1982 (Tr. 88–95).

never carried items heavier than ten pounds (*id.*).[6]  She also supervised more than 100 people (*id.*).  During the time Plaintiff was employed with the DOC, she sought treatment for her physical conditions and was treated with massage therapy, physical and chiropractic therapy, and pain medication (*see* Tr. 73–75).

 The record also contains an untitled disability report completed by Plaintiff on October 20, 2003 (Tr. 96–99).  Plaintiff described her pain as burning, stabbing, drilling, and aching with pressure and stiffness in her neck radiating into her shoulders (Tr. 96).  She claimed to have a loss of sensation in her fingers and a "deep dull ache in [her] arm" (*id.*).  She also claimed to have deep burning, to dull, to sharp, aching pain in her lower back, right side, and in the center of her back (*id.*).  In addition, Plaintiff described feeling burning, sticking, pins-and-needles radiating down the back of her legs (*id.*).  She also claimed that the cervical and lumbar regions of her back were in constant pain and that the pain in her right shoulder was intolerable (*id.*).  She stated that her pain was constant and caused by standing more than ten minutes, prolonged sitting in one position, bending over, reaching overhead, prolonged walking or running, any physical stress on her spine or lifting heavy objects, making quick turns with her head from right to left, or having to hold her neck or back down for any length of time (*id.*).  Plaintiff indicated that she was taking more than nine medications for pain including Flexeril, Topamax, and Naproxen (*id.*).  She stated that these medications relieved her pain but "not the burning sensation or the pins-and-needles sensation in [her] fingers" (Tr. 97).  Plaintiff also noted that she was treated with a TENS unit, physical therapy, and massage therapy (*id.*).  With regard to her activities of daily living, Plaintiff stated that she cooks most of her meals sitting down, cares for her personal needs (but it takes longer than before), does not do household chores, uses the dryer now instead of placing laundry outside, shops with the assistance of family members, sometimes sleeps in a recliner because of neck pain, drives but has difficulty due to neck pain, and no longer engages in sports or social activities because of her pain (Tr. 97–98).

---

[6]Plaintiff's work history report states that she walked, stood, and handled, grabbed, or grasped big objects, and wrote, typed, or handled small objects eight hours a day; and she reached, sat, climbed, stooped, kneeled, crouched, and crawled four hours a day (Tr. 90).  Plaintiff also indicated that she "carried mail bags approx. 10–12 lbs. at least [one and a half] miles . . ." each day (*id.*).

On March 10, 2004, Plaintiff completed a reconsideration disability report (Tr. 100–03).[7] She indicated that her pain had increased in her right arm, across the back of her shoulders, in her neck, and in the lower portion of her back (Tr. 100). She also said that her pain increased while walking, sitting, and lying flat on her back (*id.*). Plaintiff further stated that she has difficulty wearing items that have buttons, often has to seek assistance from family members with her personal needs, and has to use her left hand for most of her activities (Tr. 102). She also said that she needs more assistance with preparing meals, household chores, and social activities (e.g., watching television, playing games) due to pain (*id.*)

On March 22, 2006, at her hearing before the ALJ, Plaintiff testified that she worked for ten years as a correctional officer, but she stated that she can no longer perform her past work due to a herniated disc with burning and tingling pain that began in approximately January 2001 (Tr. 431–32). She testified that she had to resign from her job in December 2002 because the job required her to be "100 percent physically fit" (Tr. 431). Plaintiff testified that she tried to go back to her work after surgery (anterior cervical discectomy surgery with plating in her neck (Tr. 433)), but she was able to work for only three to four days (Tr. 432). She also tried to work at the Department of Juvenile Justice during late 2005 in a similar position, but she was able to work for only two weeks (*id.*). She noted that although she has had surgery, she still has pain (Tr. 433–34). Her medications include Methadone, Ultram, Flexeril, Zanaflex, Topamax, Anaprox, Darvocet, Motrin, Gabitril, Antivert, and Premarin (*see* Tr. 303, 323, 433–34, 441–42). She can only sit for 5 to 10 minutes, stand for 10 to 15 minutes, and walk about a half-mile (Tr. 434–35). She cannot lift a gallon of milk without pain (Tr. 435). Reaching overhead causes burning in the back of her head, and she has difficulty turning her head around (*id.*). She sleeps only about 3 to 4 hours at night and naps during the day (Tr. 438). She spends half the day lying down (*id.*). She has difficulty with concentration (*id.*). She rated her pain as an 8 on a 10-point pain scale and indicated that she has pain every day (Tr. 439–40). Rainy weather affects her neck. Plaintiff stated that her pain is sharp, burning, and pinching, and it is complicated by muscle spasms (Tr. 440). Her neck, arms, legs, hands, fingers, and shoulders have radiating pain (*id.*). Her fingers are always numb (*id.*). She has

---

[7]An undated disability appeal report contains similar information (*see* Tr. 104–10).

muscle spasms every 30 to 45 minutes in her lower back (Tr. 441).  The side effects from her medications include nausea and dizziness (Tr. 442). She has weakness in her right leg (*id.*).  She is also depressed, but she testified that her doctors took her off medication for depression (Tr. 443). Finally, Plaintiff testified that she did not remember being treated by a Dr. Sharma, and Plaintiff did not submit any records from Dr. Sharma (Tr. 444).

B.      Relevant Medical History[8]

The record establishes that a cervical spine MRI scan of October 19, 2001, revealed a developmentally small spinal canal and a disc herniation at C4–C5, worse on the right, with mild cord compression and some evidence of cord damage at that level.  Plaintiff was referred for neurosurgery and given a Philadelphia "J" collar (Tr. 201–02).  On examination on February 15, 2002, Plaintiff had a positive Tinel's sign with full range of motion on the wrist and guarded range of motion on the neck.  ARNP Molly Nicholas opined that Plaintiff had carpal tunnel syndrome with back muscle spasms (Tr. 200).  Cervical and thoracic spine MRI scans of April 22, 2002 showed evidence of normal findings, aside from a developmentally small spinal canal and a prior anterior cervical fusion at C4–C5, with hardware and screws in the C4 and C5 vertebral bodies.  Increased signal in the spinal cord at C4–C5, however, indicated some active process at that level (Tr. 191–93).

James V. Gainer, M.D., examined Plaintiff at Shands Healthcare on November 6, 2001 for complaints of numbness and tingling of the extremities.  Dr. Gainer reviewed a cervical MRI scan which showed a central herniated nucleus pulposus at C4–C5 with secondary spinal cord changes. Dr. Gainer's impression was a central herniated nucleus pulposus at C4–C5, spinal cord compression, and right carpal tunnel syndrome (Tr. 252–55).

On February 28, 2002, radiographs of Plaintiff's thoracolumbar spine were normal, and no abnormality was found (Tr. 199).

Plaintiff underwent an MRI scan of the brain on May 2, 2002, which showed no evidence of demyelinating disease.  However, a peculiar appearing glomera of the choroid plexus raised the

---

[8]The relevant medical history is provided as it was summarized by the ALJ (*see* Tr. 15–17).  In addition, where relevant, the court has supplemented the medical history with information provided by Plaintiff (*see* Doc. 13 at 10–11, 13–19) and with other relevant information contained in the record.

possibility of meningiomas (Tr. 187–88).   A repeat MRI of the brain was recommended (Tr. 187), which was done on August 13, 2003, and it showed no change from the May 2002 study (Tr. 167–68).

Plaintiff had a lumbar spine MRI on July 10, 2002, which revealed mild multi-level degenerative facet changes and ligamentum flavum hypertrophy resulting in minimal narrowing of some lateral recesses, and to a lesser extent, of the central canal.   No significant abnormality of the intervertebral discs was seen (Tr. 184–85).   Medical reports of July 8, 2003 indicate that Plaintiff had chronic cervical and lumbar back pain (Tr. 170).

Plaintiff has a history of abdominal myomectomy with lysis of adhesions and resection of endometrioma in the left ovary in December 2002.   A pelvic ultrasound study of September 18, 2003 showed normal ovaries and no definite evidence of a previously noted fibroid (Tr. 160–61).

Edward Valenstein, M.D., examined Plaintiff at Shands Healthcare on July 20, 2003.   Dr. Valenstein noted Plaintiff's complaints of trouble sleeping, irritability, easy fatigue, ankle swelling, and frequent urination.   He remarked that she was essentially normal on physical evaluation.   He noted that Plaintiff's sensation was "normal except for slightly decreased vibratory sensation in the right hand and decreased two-point discrimination in the right hand" (Tr. 240).   He also noted that Plaintiff previously had significant myelopathy prior to discectomy, but this problem resolved with surgery in February 2002.   Dr. Valenstein declined to do a nerve study to rule out carpal tunnel entrapment because he opined that Plaintiff's symptoms were not consistent with carpal tunnel entrapment.   Finally, Dr. Valenstein opined that no further workup was needed on Plaintiff, and he recommended that she be treated symptomatically.   He also remarked that use of antidepressants should be considered because Plaintiff appeared to be depressed (*id.*).

Plaintiff had an excision of a suspicious mammographic lesion on the left breast on October 2, 2003, which proved to be benign (Tr. 111–26).   She underwent a successful bilateral uterine artery embolization on November 24, 2003 (Tr. 139–40).   On January 30, 2004, Plaintiff was treated at North Florida Regional Medical Center for complaints of gastric pain.   She was given a gastrointestinal cocktail with Lidocaine which relieved her symptoms.   The diagnosis was acute gastritis (Tr. 146–47).   Plaintiff was discharged in satisfactory condition with directions to rest, increase fluid intake, and avoid spicy food (Tr. 147).

Robert A. Greenberg, M.D., examined Plaintiff on February 2, 2004 for complaints of neck, low back, and migraine headache pain.  Dr. Greenberg's impression was probable osteoarthritis of the cervical and lumbar spines (Tr. 148–50).

On January 26, 2004, Plaintiff presented to Oscar B. DePaz, M.D., a rehabilitation medicine specialist, who noted that her neck pain and right upper extremity pain with neurologic symptoms had markedly worsened over the last year.  On examination Plaintiff had decreased motor strength in the right hand compared to the left, as well as decreased sensory findings on the right (Tr. 274). Dr. DePaz also noted that Plaintiff had "vocational dysfunction" and ordered electrodiagnostic studies of her right upper extremity (*id.*).  On February 7, 2004, a cervical spine MRI scan showed evidence of the anterior interbody fusion at C4–C5 and degenerative changes above and below the fusion, without evidence of spinal cord compression or foraminal stenosis (Tr. 267, 321). Electromyelogram and nerve conduction studies of the right upper extremity, associated paraspinal muscles, right median and right ulnar nerve-sensory, and motor findings of February 9, 2004 were all normal (Tr. 267–68).  On February 18, 2004, after review of the MRIs and electromyelogram studies, Dr. DePaz prescribed Methadone and discussed pain management with Plaintiff (Tr. 267). Plaintiff returned to Dr. DePaz on March 29, 2004 (Tr. 265).  Dr. DePaz continued her treatment with Methadone and noted that she was directed to continue home exercises and home modalities (*id.*).  Dr. DePaz noted that Plaintiff was not fit for her job as a corrections officer (*id.*).  Dr. DePaz also noted that on June 9, 2004, electrodiagnostic studies showed no evidence of acute or chronic radiculopathy of the right upper extremity (Tr. 262).  In each medical report, Dr. DePaz noted: "Vocational History: Occupation: Prior work as correctional officer.  [Plaintiff] saw Dr. Sharma 10/07/02 for disability evaluation who did not recommend returning to that vocation due to the unpredictable nature of same.  He advised light activities with no overhead activities or pushing, pulling with right arm" (Tr. 262–64).  Dr. DePaz examined Plaintiff again on June 23, 2004 (Tr. 262–63).  Dr. DePaz noted that Plaintiff's main complaints concerned her ongoing neck and back pain (Tr. 262).  Her medications included Topamax, Flexeril, Zanaflex, Ultram, Phenergan, and Anaprox (*id.*).  Dr. DePaz essentially continued Plaintiff's drug regimen and requested that she follow up in six weeks (Tr. 263).

Steven A. Reid, M.D., a neurological surgeon, examined Plaintiff on April 30, 2004 for complaints of neck pain with pain radiating into her shoulders.  Plaintiff's examination revealed intact strength throughout, with normal muscle tone, positive reflexes, and no atrophy or fasciculations.  She had normal response to pinprick in her right hand and over the left 2, 4 and 5 digits.  Dr. Reid concluded that Plaintiff might have a chronic cervical sprain, cervical spondylosis, or a postoperative complication related to her hardware (Tr. 259–60).

A lumbar spine MRI scan of July 1, 2004 revealed a developmentally smaller than average spinal canal, and lower lumbar facet arthropathy with very early foraminal and lateral recess compromise, probably not enough to produce radiculopathy.  A post myleogram CT scan of the lumbar spine performed on March 28, 2005 was negative (Tr. 289–90).

An upper endoscopy and biopsy of March 26, 2004 revealed mild, non-erosive gastritis (Tr. 331–33).  Plaintiff had a history of treatment for Helicobacter Pylori gastritis with resolution of abdominal pain in 2004.  She was tested for Helicobacter Pylori again on May 25, 2005, but it was not detected (Tr. 326).

On July 28, 2005, Plaintiff had a chest x-ray and an abdominal sonography that were normal (Tr. 291–93).  In response to complaints of atypical chest pain on October 10, 2005, Plaintiff had a cardiac catheterization that was completely normal (Tr. 300–01).

Plaintiff submitted a March 26, 2006 report by Dr. Lipnick to the Appeals Council; this report was not considered by the ALJ because Plaintiff apparently did not submit it to the ALJ at or prior to her hearing.  In the report, Dr. Lipnick described a spinal joint injection procedure that he performed on Plaintiff.  In short, bilateral junctions of Plaintiff's spine at L3–L4 and L4–L5 were anesthetized with a Lidocaine solution (*see* Tr. 425–26).  Dr. Lipnick reported that Plaintiff described her pain as being a 7 out of 10 before the procedure but a 0 out of 10 after the procedure (Tr. 426).  Dr. Lipnick noted that the procedure provided Plaintiff with temporary relief, and he advised that "a series of facet joint injections or possibly lumbar dorsal medial branch blockade and rhizotomy [may provide] more permanent relief of her back pain" (*id.*).

C.       Other Information Within Plaintiff's Claim File

Terry T. Rees, M.D., completed a Physical RFC Assessment on February 10, 2004 (Tr. 216–23).  He opined that Plaintiff was able to frequently lift or carry ten pounds, occasionally lift or carry twenty pounds, and she could stand, walk, or sit six hours in an eight-hour workday (Tr. 217).  Her ability to push or pull was unlimited despite her complaints of back pain, which Dr. Rees expressly noted (*see* Tr. 217–18).  Plaintiff was frequently able to climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but she could never climb ladders, ropes, or scaffolds (Tr. 218). Plaintiff had no manipulative, visual, or communicative limitations (Tr. 219–20).  She also had no environmental limitations, except she should avoid concentrated exposure to hazards such as machinery or heights (Tr. 220).  Dr. Rees also noted that her "symptoms are credible" but nevertheless evaluated her physical RFC as indicated above (*see* Tr. 221).

Reuben E. Brigety, M.D., completed a Physical RFC Assessment on July 16, 2004 (Tr. 281–88).  Dr. Brigety opined that Plaintiff was able to frequently lift or carry ten pounds, occasionally lift or carry twenty pounds, and she could stand, walk, or sit six hours in an eight-hour workday (Tr. 282).  Her ability to push or pull was limited in her upper extremities, and she was to avoid repetitive pushing and pulling with her upper extremities (*id.*).  Plaintiff was occasionally able to climb and frequently able to balance, stoop, kneel, crouch, and crawl (Tr. 283).  Additionally, Plaintiff was to avoid exposure to hazards such as heights, but no visual or communicative limitations were established (Tr. 284–85).

Finally, a vocational expert ("VE") testified at Plaintiff's hearing before the ALJ.  The VE testified that he had reviewed Plaintiff's file, including the relevant vocational exhibits and her past relevant work history (Tr. 445).  The VE also testified that he was present for the hearing and listened to Plaintiff's testimony (Tr. 446).  The VE described Plaintiff's prior work as primarily in the corrections field as a correctional officer (Tr. 447).  The VE explained that the Dictionary of Occupational Titles ("DOT") typically classifies corrections officer employment as semiskilled work that requires medium exertion; however, the VE noted that Plaintiff testified that she performed this work at a light exertional level, and "there is a segment of that job [(correctional officer)] that does

work at a light level certainly" (Tr. 447–48).[9]  In particular, the VE noted that some correctional officers "primarily [do] monitoring and administrative aspects of the work" (Tr. 448).  Moreover, the VE noted that some of the skills Plaintiff learned as a correctional officer would transfer to "lighter and even sedentary occupations, such as the security guard jobs or gate guard jobs or surveillance system monitor jobs" (Tr. 449).  The VE also reviewed Plaintiff's past employment as a hospital cleaner, an unskilled position that required a medium exertional level (Tr. 448).  Next, the VE gave his opinion on five hypothetical questions (*see* Tr. 449–53).  First, if a person was a younger individual with a high school education, had the same work experience as Plaintiff, and was restricted to lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing/walking/sitting about six hours in an eight-hour day; never climbing ladders, ropes, or scaffolds; and avoiding concentrated exposure to hazards such as moving machinery, unprotected heights, deep water, and fire, the VE testified that Plaintiff would be able to return to her past work as she described it because it was light-level work, but she would be unable to return to her work as it is described by the DOT because it is classified as medium-level (Tr. 449–50).  Second, given the same person "restricted to light activities with no overhead activities or pushing or pulling with her right arm," the VE stated that he did not have enough information to render an opinion on such a person (Tr. 450).  Third, assuming the same person as in the first hypothetical "with the addition of crawling . . . occasionally and [] limited [] reaching overhead," the VE testified that Plaintiff would not be able to return to her prior work as described by the DOT, but she would be able to return to her past work as a correctional officer as she described (Tr. 451).  Fourth, given the same person as in the first hypothetical, but with the added restrictions of sitting for no more than 5 to 10 minutes, standing for no more than 10 to 15 minutes, walking for only a half-mile, lifting no more

---

[9]Medium work is defined as:
   Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects.  Physical Demand requirements are in excess of those for Light Work.
U.S. Department of Labor, DICTIONARY OF OCCUPATIONAL TITLES, Appx. C at IV(c) (4th ed. 1991) (hereafter "DOT").
   Light work is defined as:
   Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects.  Physical demand requirements are in excess of those for Sedentary Work.
*Id.*

than a gallon of milk, with pain in her back, difficulty turning her head, spending half the time lying down, and with difficulty concentrating, the VE opined that Plaintiff would be completely unable to work (Tr. 451–52).  Fifth, again assuming the same person as in hypothetical one, with the added restriction of having to lie down from 3 to 5 times per day for about 10 to 15 minutes because of neck and back pain, the VE opined that Plaintiff could not perform her past relevant work as a correctional officer as she described it and also could not perform some of the other lighter jobs previously described by the VE (Tr. 452–53).

 V.    DISCUSSION

        Plaintiff argues that the Commissioner's decision is not supported by substantial evidence (Doc. 13 at 13–19).  Specifically, Plaintiff argues that the ALJ failed to (1) adequately weigh Dr. DePaz's opinion; (2) properly apply the Eleventh Circuit's three-part pain standard; and (3) correctly formulate her RFC (id. at 13–19).

        A.    Dr. DePaz's Opinion

        Plaintiff argues that Dr. DePaz's opinion that she was not fit for her job as a correctional officer should have been given substantial weight by the ALJ (see id. at 13–14).[10]  In particular, Plaintiff cites to the following statement by Dr. DePaz: " 'Vocational History: Occupation: Prior work as correctional officer.  She saw Dr. Sharma 10/07/02 for disability evaluation who did not recommend returning to that vocation due to the unpredictable nature of same.  He advised light activities with no overhead activities or pushing, pulling with right arm' " (id. at 13 (quoting, for example, Tr. 263) (emphasis removed)).  Plaintiff also states that Dr. DePaz remarked "Vocational Issues: Not work fit for her job as a correctional officer" (Doc. 13 at 13 (quoting Tr. 265)).  In response, the Commissioner argues that the ALJ gave proper weight to Dr. DePaz's opinion because Dr. DePaz's opinion that she could not return to her past relevant work as a correctional officer was not a medical opinion but rather was a legal conclusion reserved to the Commissioner for consideration (Doc. 16 at 4–5).

_____

        [10]The court notes that Plaintiff's arguments concerning Dr. DePaz's opinion are unclear.  Specifically, after quoting Dr. DePaz's medical records, Plaintiff describes the weight that is to be given to a treating physician's opinion (see Doc. 13 at 13–14).  However, Plaintiff never explicitly says what was incorrect about the ALJ's consideration of Dr. DePaz's opinion.  Moreover, following Plaintiff's description of Dr. DePaz's records and the relevant law, she then quotes additional medical records without stating their relevance to her argument (see id. at 14–15).

        Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* <u>Lewis</u>, 125 F.3d at 1439–41; <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir. 1991);  <u>Sabo v. Commissioner of Social Security</u>,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* <u>Edwards</u>, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* <u>Wheeler v. Heckler</u>, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* <u>Schnor v. Bowen</u>, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* <u>Wilson v. Heckler</u>, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

        The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner.

20 C.F.R. § 404.1527(e).  The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims.  The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner.  For instance, 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion.  Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner.  20 C.F.R. § 404.1527(e)(3); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").  Although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record.  SSR 96-5p.  In Lewis, 125 F.3d at 1441 (11th Cir. 1997), the court reversed the ALJ's finding of no disability, in part because the ALJ relied on a treating physician's report that the claimant could no longer work as a longshoreman when this report was ambiguous as to whether the claimant could do any work, and the physician subsequently wrote a letter saying the claimant was completely disabled.  To require the Commissioner to accept as controlling a statement that a patient is or is not disabled would require the Commissioner to credit the physician not only with knowledge of the patient's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters.  Additionally, a physician's opinion on whether a person is able to work may be colored by such things as the physician's knowledge of local hiring practices, whether there are specific job vacancies, a person's reluctance to do a particular kind of work, and similar matters.  These things are not properly considered by the Commissioner in determining disability.  20 C.F.R. § 404.1566.  For all these reasons, a physician's opinion that his or her patient cannot work or is disabled is not a conclusive

medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.

Finally, the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole. *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).[11]

In the instant case, the ALJ determined that the objective medical evidence showed that Plaintiff had "the following severe impairments: complaints of neck and back pain, status-post anterior cervical fusion at C4–C5 with hardware and screws, right carpal tunnel syndrome, a history of gastritis[,] and treatment for Helicobacter Pylori with resolution of abdominal pain in 2004" (Tr. 17). However, the ALJ found that Plaintiff did not "have any impairment or a combination of impairments that specifically meets or equals any of the listed impairments . . . " (*id.*). In reaching these conclusions, the ALJ specifically considered Dr. DePaz's medical records (*see* Tr. 16). The ALJ also reviewed other the relevant medical records as discussed in greater detail *supra*.[12]

Initially, the court notes that while Plaintiff is correct that Dr. DePaz's records contain the statement "Vocational Issues: Not work fit for her job as a correctional officer" (Doc. 13 at 13 (quoting Tr. 265)), her argument that the ALJ was required to give this statement substantial weight is without merit. The ALJ, not Plaintiff's physicians, is responsible for making the determination of whether she meets the statutory definition of disability. *See* 20 C.F.R. § 404.1527(e). Moreover, the ALJ is not required to give any special significance to Dr. DePaz's statement that Plaintiff could not return to her past relevant employment. *See id.* In the end, the ALJ is required to consider Dr.

---

[11]The Eleventh Circuit adopted as binding precedent all former Fifth Circuit Unit B decisions after October 1, 1981. Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir. 1982).

[12]Because the summary set out above is taken from the ALJ's opinion, the court will not reiterate all of the relevant medical facts here. It is sufficient to note that, in addition to Dr. DePaz's records, the ALJ reviewed Plaintiff's testimony related to her impairments, several MRI and CT scans, radiographs, Dr. Gainer's records, Dr. Greenberg's records, Dr. Reid's records, ultrasound and biopsy records, and other medical records before reaching his conclusions. Plaintiff does not identify any error in the ALJ's review of these medical records, except her argument as to Dr. DePaz.

DePaz's opinions concerning the nature and severity of Plaintiff's impairments, but the question of whether Plaintiff is disabled or unable to work is a legal conclusion reserved to the ALJ. *See* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner); *see also* <u>Lewis</u>, 125 F.3d at 1441.

The ALJ's summary of Dr. DePaz's medical findings is consistent with the record. Specifically, the ALJ noted that Dr. DePaz's records showed that Plaintiff complained of neck and right upper extremity pain, that she had decreased motor strength and sensory findings in her right hand compared to her left, that she had a cervical fusion at C4–C5, and that her pain was being managed with medication (*see.* Tr. 17; *see also* Tr. 267, 272 (Dr. DePaz's records)). The ALJ also noted that Dr. DePaz's records showed that nerve electromyelogram and nerve conduction studies of Plaintiff's right upper extremity, associated paraspinal muscles, right median and right ulnar nerve-sensory and motor findings were normal (*see* Tr. 17; *see also* Tr. 267). Moreover, the ALJ noted that Dr. DePaz's records contained references to MRI's showing that while there were degenerative changes above and below Plaintiff's cervical spine fusion at C4–C5, there was no "evidence of spinal cord compression or foraminal stenosis" (Tr. 17; *see also* Tr. 262). Finally, the ALJ also acknowledged that Dr. DePaz's records contained a notation regarding Dr. Sharma's recommendation that Plaintiff not return to her work as a correctional officer (*see* Tr. 17; *see also* Tr. 263). However, as the ALJ was aware, Plaintiff testified that she did not remember being treated by a Dr. Sharma (*see* Tr. 444).

Next, as noted *supra* in footnote ten, Plaintiff does not make any specific argument regarding the ALJ's consideration of Dr. DePaz's records. Plaintiff merely quotes from MRI reports and a report by Dr. Valenstein without explaining the relevance of these records to her argument regarding the consideration of Dr. DePaz's opinion (*see* Doc. 13 at 14–15). Nevertheless, the court will discuss the reports identified by Plaintiff.

First, Plaintiff quotes MRI results from February 7, 2004 and April 22, 2002 (*see id.*). The February 7, 2004 cervical spine MRI showed interbody fusion with instrumentation at C4–C5, a defuse bulge about this fusion, and disc degeneration at C5–C6 (Tr. 321). No cord compression or foraminal narrowing was present (*id.*). "The remainder of the cervical spine [was] unremarkable" (*id.*). Similarly, the April 22, 2002 cervical spine MRI showed the same fusion and a slight bulge

at C3–C4 but also found no foraminal stenosis (Tr. 191).  The April 2002 MRI reported a focal abnormality ("increased signal in the spinal cord") within the spine at C4–C5 (*see* Tr. 191–92).  The ALJ explicitly reviewed these MRI's noting the same essential findings (*see* Tr. 15, 16).  Moreover, these records are consistent with Dr. DePaz's records (*see* Tr. 262, 267, 272),[13] and they are also consistent with the ALJ's summary of Dr. DePaz's records (*see* Tr. 17).

Second, Plaintiff quotes a portion of a neurology report written by Dr. Valenstein on July 2, 2003 (Doc. 13 at 15).  The report related Plaintiff's subjective complaints of pain and reviewed MRI's from before Plaintiff's discectomy in October 2001, which showed a "very significant C4–5 protruding disc" (Tr. 239).  Dr. Valenstein noted that Plaintiff's myelopathy resolved after the surgery in 2001, but Plaintiff alleged that the symptoms returned in February 2002, "when she again began to complain of numbness in the right hand and tingling in her arm and down her neck and back and a pinching sensation in her legs," as well as pain running up her arms, a feeling of coldness in her right hand, and a burning sensation running down her neck (Tr. 239).  Dr. Valenstein noted that a "reason for this relapse [was] not evident either on neurologic examination on [April 29, 2004] or on review of her imaging studies" from April and August 2002, which both showed that the surgical decompression was successful (Tr. 239–40).  Dr. Valenstein opined that further nerve conduction studies to rule out carpal tunnel entrapment were unnecessary because Plaintiff's symptoms were atypical and could not be explained by carpal tunnel entrapment (*see* Tr. 239–41).  The report also noted that Plaintiff should be treated "symptomatically" without the need for any additional work-up (Tr. 240).  Although the ALJ did not specifically reference Dr. Valenstein's report, Plaintiff does not claim that the ALJ erred in this regard.  Rather, Plaintiff references Dr. Valenstein's report in support of her argument that the ALJ erred in his consideration of Dr. DePaz's records.  Nevertheless, the court notes that Dr. Valenstein was a one-time examining physician, and as such, his opinion is not entitled to as much weight as that of a treating source.  *See* 20 C.F.R. § 404.1527(d)(2). Moreover, Dr. Valenstein's report does not contradict the medical evidence contained in Dr. DePaz's records (which, excluding the opinion that Plaintiff could not return to her job, were accepted by the ALJ).  Dr. DePaz's records show that subsequent electromyelogram and

---

[13]The February 7, 2004 MRI was actually considered by Dr. DePaz (*see* Tr. 267), as the ALJ was clearly aware (*see* Tr. 17 (discussing Dr. DePaz's review of this MRI)).

nerve conduction studies were normal and revealed that the medications Dr. DePaz used to treat Plaintiff's symptoms " 'help[] a lot' " (Tr. 264 (Dr. DePaz quoting Plaintiff in March 2004)). Therefore, the ALJ's failure to specifically note Dr. Valenstein's report was harmless error, as his report is consistent with the record as a whole. *See, e.g.*, East v. Barnhart, 197 Fed. Appx. 899,  901 n.3 (11th Cir. 2006) (failure to mention psychologist's report harmless where findings in report were consistent with ALJ's ultimate determination); *see also* Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (misstatements harmless where ALJ applied correct legal standard despite the first misstatement, and the second misstatement was irrelevant).  Furthermore, the court finds that Dr. Valenstein's report does not compel a finding that Plaintiff was unable to work.  Indeed, he found no objective evidence to support Plaintiff's claim of a relapse, and he opined that Plaintiff should be treated symptomatically.

In summary, the ALJ did not err in his consideration of Dr. DePaz's records, and Plaintiff is not entitled to relief on this ground.

B.      Eleventh Circuit Pain Standard

Plaintiff argues that the ALJ improperly rejected her subjective complaints of pain (Doc. 13 at 16–17).  In particular, Plaintiff argues that her subjective testimony of pain, taken together with all of the medical findings in the record, "is itself enough for a finding of disability" (*id.* at 19).[14] In response to Plaintiff's argument, the Commissioner asserts that the ALJ properly identified and considered the pain standard as set out in 20 C.F.R. § 404.1529 (Doc. 16 at 5–6).  The Commissioner also urges the court to find that the ALJ properly discounted Plaintiff's subjective complaints and that the ALJ's decision is substantially supported by the record (*id.* at 6–8).

Pain is treated by the Regulations as a symptom of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, "unless medical signs or findings show that there is a medical condition that could be

---

[14]Plaintiff's argument, in its entirety, is articulated as follows:  The ALJ "simply reject[ed] YOUNG's pain testimony [Tr. 432–48] which at a minimum shows she repeatedly has problems with pain which limits her ability to function normally,"  and  "Under the standard of this Circuit [], pain testimony, such as [Plaintiff's] *supra*, supported by medical evidence of a condition or conditions, such as have been described and diagnosed, which are normally the cause or causes of severe pain and periodic incapacity, and which can reasonably be expected to cause the pain and incapacity alleged by [Plaintiff], is itself enough for a finding of disability" (Doc. 13 at 17, 19) (internal citations omitted).

reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929.  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991); Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard."  Wilson, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself."  Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence."  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)).  However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  *Id.*; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[I]f the Commissioner refuses to credit [subjective testimony of the Plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true."  MacGregor v. Bowen, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely

be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. Jones v. Dep't. of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain."  Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[15]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  Hand, 761 F.2d at 1548–49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).  Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

In the instant case, the ALJ specifically referenced the three-part pain standard established by the Eleventh Circuit (see Tr. 17–18).  The ALJ also cited to 20 C.F.R. §§ 404.1529, 416.929 (see Tr. 18).  The ALJ then applied the standard.

First, the ALJ found evidence of a severe underlying medical condition, namely Plaintiff's "complaints of neck and back pain, status-post anterior cervical fusion at C4–C5 with hardware and screws, right carpal tunnel syndrome, a history of gastritis and treatment for Helicobacter Pylori with

---

[15]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

resolution of abdominal pain in 2004" (Tr. 17).  Next, the ALJ concluded that Plaintiff's subjective complaints of disabling pain were only "partially credible" (Tr. 18).  The ALJ may properly find subjective complaints of pain not credible if he articulates reasons that are supported by the record. *See* Jones, 941 F.2d at 1532.

Here, in support of his findings, the ALJ first stated that no medical evidence showed a finding of right leg weakness (Tr. 18).  Moreover, the ALJ noted that, despite Plaintiff's claim that her "fingers are always numb," electrodiagnostic testing showed normal sensation in Plaintiff's fingers and no evidence of acute or chronic radiculopathy in her right upper extremity (*id.*). Additionally, the ALJ noted that although Plaintiff had cervical spine fusion surgery at C4–C5, diagnostic tests have shown evidence of only "mild" or no cord compression (Tr. 18).  The ALJ further found that Plaintiff was treated for Helicobacter Pylori, and that subsequent tests and a biopsy in March 2004 revealed only mild non-erosive gastritis (*id.*).

The record substantially supports the ALJ's findings.  First, Plaintiff has not identified any medical records that would support a finding of right leg weakness resulting in pain.  Moreover, the court's own search of the record revealed only that Plaintiff testified that she had right leg weakness (*see* Tr. 442).  Plaintiff stated in her testimony that a "Dr. Greg," at Dr. DePaz's office, said that her right leg weakness was probably related to the pain that she has in her back (*see id.*).  However, Dr. DePaz's records do not contain any such notation, nor do they mention a "Dr. Greg."  Second, Dr. DePaz's records confirm that electrodiagnostic studies showed no evidence of acute or chronic radiculopathy of the right upper extremity (Tr. 262).  Moreover, electromyelogram and nerve conduction studies of the right upper extremity, associated paraspinal muscles, right median and right ulnar nerve-sensory, and motor findings were all normal (Tr. 267–68).  Third, medical records show that Plaintiff's Helicobacter Pylori gastritis was successfully treated with resolution of abdominal pain in 2004 (*see* Tr. 331–33), and tests for Helicobacter Pylori again on May 25, 2005 were negative (Tr. 326).  Additionally, the record confirms the ALJ's statement regarding Plaintiff having only "mild" or "no" cord compression (*see* Tr. 202, 321).

Next, as the ALJ noted, the objective medical evidence does not support Plaintiff's allegations of disabling physical limitations (*see* Tr. 20, *see also* Tr. 15–17 (ALJ's summary of medical evidence)).  In particular, MRI scans from April 2002 showed evidence of normal findings,

aside from a developmentally small spinal canal, and a prior anterior cervical fusion at C4–C5 with hardware and screws in the C4 and C5 vertebral bodies (Tr. 191–93).  February 2002 radiographs of Plaintiff's thoracolumbar spine were normal (Tr. 199).  Another MRI on July 10, 2002 revealed mild multi-level degenerative facet changes and ligamentum flavum hypertrophy resulting in minimal narrowing of some lateral recesses, and to a lesser extent, of the central canal but no significant abnormality of the intervertebral discs was seen (Tr. 184–85).  A February 7, 2004 cervical spine MRI scan showed no evidence of spinal cord compression of foraminal stenosis (Tr. 267, 321).  February 2004 electromyelogram and nerve conduction studies of the right upper extremity were all normal (Tr. 267–68).  Additionally, Dr. Reid, a consulting neurological surgeon, examined Plaintiff on April 30, 2004 for complaints of pain and found that she had intact strength with no atrophy or fasciculations, normal muscle tone, and positive reflexes throughout (*see* Tr. 259–60).  She had normal response to pinprick in her right hand and over the left 2, 4 and 5 digits (*id.*).  A post myleogram CT scan of the lumbar spine from March 2005 was negative (Tr. 289–90). A July 2005 chest x-ray and abdominal sonography were normal (Tr. 291–93).  On March 26, 2004, an upper endoscopy and biopsy revealed mild non-erosive gastritis (Tr. 331–33), and as noted above, Plaintiff had a history of treatment for Helicobacter Pylori gastritis, but a test for it on May 25, 2005 was negative (Tr. 326).  Therefore, the ALJ correctly noted that the objective medical evidence did not support Plaintiff's claims of disabling pain.  Although a claimant's subjective complaints cannot be disregarded solely because they are not fully supported by objective medical evidence, *see* 20 C.F.R. §§ 404.1529(c)(2), a lack of objective medical evidence is a factor an ALJ may consider in determining a claimant's credibility.  *See* Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004), *citing* Tennant v. Apfel, 224 F.3d 869, 871 (8th Cir. 2000).

Furthermore, Plaintiff's allegations of disabling pain are also contradicted by other evidence. For example, the ALJ noted that Plaintiff stated that her medications relieve her pain (Tr. 19). Indeed, Dr. DePaz's records show that Plaintiff remarked that her medications " 'help[] a lot' " (Tr. 264 (quoting Plaintiff)).  Moreover, Dr. DePaz's records from June 2004 reveal that Plaintiff's pain was essentially being managed by medication (*see* Tr. 262–63 (continuing Plaintiff's drug regimen and requesting that she follow up in six weeks)), and Plaintiff indicated in a disability report that medications relieved her pain (Tr. 97).  Similarly, Dr. DePaz's records from March 29, 2004 showed

that Plaintiff's pain medication was "working very well" (*see* Tr. 20; *see also* Tr. 265 (Dr. DePaz's records)).  "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (quoting Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987) (footnote omitted)).  Additionally, Dr. Valenstein noted that no further workup was needed on Plaintiff, and she should be treated symptomatically (Tr. 240).  Thus, the record contains no indication that Plaintiff was in need of another surgery (as the ALJ noted, Plaintiff "is not a surgical candidate" (Tr. 20)); rather, her physicians either treated her with medication or "symptomatically."  Also, Plaintiff noted in a disability report that she had been treated with a TENS unit, massage therapy, and physical therapy. An ALJ may properly consider treatment that is "entirely conservative in nature" in discrediting a claimant's testimony.  Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996).

Accordingly, the ALJ properly discounted Plaintiff's subjective complaints and articulated sufficient reasons, supported by the record, for doing so.

C.      Determination of RFC

Finally, based on the foregoing arguments, Plaintiff argues that the ALJ improperly formulated her RFC (Doc. 13 at 19).  The Commissioner asserts that Plaintiff's RFC was correctly determined by the ALJ and argues that the Commissioner's decision should be affirmed (Doc. 16 at 8).

Residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite her impairments.  *See* Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  As stated in 20 C.F.R. § 404.1545(a), it is the most a claimant can still do despite her limitations.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Although the RFC determination is a medical question, it is not based only on "medical" evidence (that is, evidence from medical reports or sources); rather, an ALJ has the duty, at step four, to assess RFC on the basis of all the relevant, credible evidence of record.  *See* Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description

of his limitations); <u>Dykes v. Apfel</u>, 223 F.3d 865, 866–67 (8th Cir. 2000) (per curiam) (RFC is a determination based upon all the record evidence, but the record must include some medical evidence that supports the RFC finding).  *See also* 20 C.F.R. § 404.1545; Social Security Ruling (SSR) 96-8p.

In the instant case, the ALJ determined that, "[a]fter carefully considering all of the medical evidence as well as the statements by [Plaintiff], . . . the combined effects of [Plaintiff's] impairments have reduced her [RFC] to no more than light exertional work activities" (Tr. 19).[16] In reaching this conclusion, the ALJ stated that he had also relied on the opinions of Dr. Rees and Dr. Brigety, state agency medical consultants (*id.*).

Plaintiff does not advance any specific argument to contest the ALJ's determination of her RFC except to state that Dr. DePaz's opinion supports a finding of disability, and Plaintiff's subjective testimony should be sufficient to find that she is in disabling pain (Doc. 13 at 19). However, for the reasons detailed *supra*, Dr. DePaz's opinion about Plaintiff's vocational abilities is not binding on the ALJ, and Plaintiff's subjective complaints of pain were properly discounted. *See also* 20 C.F.R. § 404.1512 (Plaintiff bears the burden of establishing that she cannot return to her past relevant work).

Furthermore, the ALJ's determination of Plaintiff's RFC and his finding that Plaintiff could perform light work, are indeed supported by conclusions of Dr. Rees and Dr. Brigety, who both found, in pertinent part, that Plaintiff could frequently lift or carry 10 pounds, occasionally lift or carry 20 pounds, and she could stand, walk, or sit six hours in an eight-hour workday.  Dr. Rees found that Plaintiff's ability to push or pull was unlimited, while Dr. Brigety noted that she was somewhat limited in her upper extremities.

---

[16]Light work is defined in 20 C.F.R. § 404.1567(b) as follows:
Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

Finally, based on Plaintiff's own description of her job's duties and the VE's testimony concerning her vocational abilities, the ALJ found that Plaintiff could return to her prior employment as a correctional officer (*see* Tr. 20–21).  In part, the ALJ's decision was based on a hypothetical question posed to the VE (*see* Tr. 20).  In this case, the VE testified that Plaintiff's own description of her job duties[17] showed that her prior relevant employment required only light exertion as opposed to the medium exertion that is called for in the DOT's description of a correctional officer's position (*see* Tr. 447–48).  As noted by the VE, "there is a segment of that job [(correctional officer)] that does work at a light level certainly" . . ., "primarily [doing] monitoring and administrative aspects of the work" (Tr. 448).  Then, the VE opined that if a person with Plaintiff's background and work history was restricted to lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing/walking/sitting about six hours in an eight-hour day; never climbing ladders, ropes, or scaffolds; and avoiding concentrated exposure to hazards such as moving machinery, unprotected heights, deep water, and fire, Plaintiff would be able to return to her past work as she described it (Tr. 449).  Even if Plaintiff had "limited [] reaching overhead," the VE still opined that she could return to her work as a correctional officer (Tr. 451).  Put another way, the ALJ found that if Plaintiff had an RFC for performing light work, she could return to her past relevant employment and is therefore not disabled under the Act (*see* Tr. 20).

A hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.  Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).  However, the ALJ is not required to include findings in the hypothetical that he has properly rejected as unsupported.  *See* McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987).  Here, aside from the arguments made above, Plaintiff has not disputed the VE's testimony.  To the extent that Plaintiff's earlier arguments are construed as suggesting that the ALJ should have accepted the VE's answer

---

[17]Plaintiff described her duties as a correctional officer in a September 23, 2003 disability report (*see* Tr. 72).  In relevant part, Plaintiff said that she handled, grabbed, or grasped big objects, reached, and wrote, typed, or handled small objects eight hours a day; walked, stooped, or stood seven hours a day; reached two hours a day; and sat one hour a day (*id.*).  She carried mail bags, health and comfort items, and paint cans, but these items never weighed more than 10–12 pounds (*see id.*; *see also* Tr. 90 (a work history report)).  She frequently lifted less than ten pounds and never carried items heavier than ten pounds (Tr. 72).

to questions containing more severe limitations (i.e., limitations based on Plaintiff's subjective complaints), the ALJ properly discounted those complaints as detailed above.  Therefore, the ALJ did not err in finding that Plaintiff could return to her past relevant employment as she performed it.  If an individual can perform her past relevant work, either as she performed it, or as the work is performed in the national economy, she is not disabled.  *See* Jones v. Chater, 86 F.3d 823, 825 (8th Cir. 1996); Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996); *see also* Social Security Ruling 82-61.   Accordingly, the ALJ did not err in finding Plaintiff "not disabled," as defined in the Act.

VI.    CONCLUSION

    For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

    Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

    At Pensacola, Florida this 2nd  day of January 2008.


                        */s/ Elizabeth M. Timothy*
                        **ELIZABETH M. TIMOTHY**
                        **UNITED STATES MAGISTRATE JUDGE**


                    <u>**NOTICE TO THE PARTIES**</u>

    **Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**